# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA
# GREENVILLE DIVISION

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | Criminal Action No. 6:11-cr-02302-JMC-1 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| John Cannon, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on Defendant John Cannon's ("Cannon") Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 145] and Supplemental Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 248] pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure.[1] The court held an evidentiary hearing on this matter on October 10, 2012. For the following reasons, the court denies Cannon's motions.

Cannon was indicted on November 15, 2011, by a Federal Grand Jury on one count of conspiracy to possess with the intent to distribute in excess of five (5) kilograms of cocaine and one count of participating in a conspiracy to launder the proceeds of drug sales. He was arrested on November 29, 2011, at his residence in Lithonia, Georgia. In connection with the investigation of this matter and Cannon's arrest, law enforcement obtained orders authorizing the collection of certain global positioning system ("GPS") data and several search and seizure warrants. Through

---

[1] The court granted Co-defendant Kasondra Cannon's motion [Dkt. No. 135] to join in Cannon's suppression motions by text order [Dkt. No. 168] dated March 2, 2012. During the hearing, Mrs. Cannon restated her motion, which the government acknowledged to the extent Mrs. Cannon had standing to assert such motion. Accordingly, the court's order on the pending motions will apply to Mrs. Cannon where appropriate.

1

these motions, Cannon seeks to establish that the orders and warrants suffered from various defects and that the seizure of evidence as a result of those orders and warrants violated his Constitutional rights.

## LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. All warrants must "(1) be issued by a neutral and detached magistrate, (2) contain a particular description of the place to be searched, and the person or things to be seized, and (3) be based upon probable cause, supported by Oath or affirmation." *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994). A magistrate judge must examine the totality of the circumstances to determine whether probable cause exists and a warrant should be issued. *Id*. Accordingly, "[t]he task of the issuing magistrate [judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 214 (1983). The magistrate judge must consider primarily "whether it is reasonable to believe that the items seized will be found in the place to be searched." *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993). Finally, when reviewing the issuance of a warrant, the reviewing court gives strong deference to the issuing magistrate judge's determinations. *See Clyburn*, 24 F.3d at 617.

"Suppression of evidence . . . has always been [the court's] last resort, not [the court's] first impulse." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006). Because the consequences of applying the rule are so dire, a defendant urging its application carries a heavy burden. *See id.* (quoting *Pennsylvania Bd. of Probation and Parole v. Scott*, 524 U.S. 357, 364-65 (1998)). Suppression

2

should be limited to cases in which its deterrent effect against law enforcement's misconduct outweighs the costs inherent in barring evidence that law enforcement expended great resources to obtain. *See Scott*, 524 U.S. at 357 (citing *United States v. Leon*, 468 U.S. 897, 907 (1984)).

## DISCUSSION

**GPS Information**

Cannon requests that this court suppress all evidence and information derived from law enforcement personnel's collection of GPS data that Cannon contends was obtained without a valid court order. Specifically, Cannon alleges that the order is invalid because a phone number in the body of the order authorizing the release of the GPS data does not match the phone number for the GPS data actually provided. The government opposes Cannon's request for the suppression of the GPS information on the ground that Cannon has no standing to challenge the government's collection of the information because Cannon has no expectation of privacy in the information. The government alleges that the phone for which it sought the GPS information was issued to "Peter Smith" and Cannon was not listed as an authorized user. Therefore, the government asserts that Cannon has no legitimate expectation of privacy in the GPS information maintained in the phone records.

"Before a defendant may contest a search, he must establish a reasonable expectation of privacy in the place searched." *United States v. Coleman*, No. 3:10-cr-238, 2012 WL 3202957, at *2 (W.D.N.C. Aug. 6, 2012) (citing *Rakas v. Illinois*, 439 U.S. 128, 143 (1978)). The United States Supreme Court recently confirmed that a reasonable expectation of privacy extends to a person with a possessory interest in a thing or place subject to a search. *See United States v. Jones*, 132 S. Ct. 945, 949 (2012).

Here, there is no dispute that Cannon is not listed as the owner or an authorized user of the phone. Therefore, Cannon may only have a privacy interest in the phone records if he has a possessory interest. At the hearing on these motions, Cannon began his argument by claiming that he had a possessory interest in the phone at issue. However, when pressed by the government and the court regarding whether Cannon was indeed stipulating that he actually possessed the phone during the relevant time period, Cannon indicated that he was not willing to so stipulate and actually argued that he did not possess the phone during the relevant time period. Because Cannon failed to establish that he had any interest in the phone, possessory or otherwise, he has no standing to challenge the order authorizing the release of the GPS information.

Additionally, to the extent that Cannon challenges the validity of the order authorizing the release of the GPS information solely on the basis of the reference to the wrong phone number in the text of the order, the court finds the challenge without merit. Mere typographical errors do not undermine a finding of probable cause and do not invalidate a warrant. *See United States v. Thomas*, No. 1:09CR360–1, 2009 WL 5215391, at *6 (M.D.N.C. Dec. 28, 2009). In this case, a review of the application for the order and supporting affidavit clearly make reference to the phone number for which information was collected. Additionally, the heading of the order references the correct phone number. The incorrect phone number appears only once in the text of the order. However, it is undisputed that the GPS information that the service provider actually provided to the government matched the correct phone number as captured in the application and heading of the order.

**Search Warrants for Georgia Properties and Seizure Warrants**

Cannon next requests the court suppress evidence obtained by the government in executing three search warrants for properties located in the State of Georgia. Cannon complains that

information from informants concerning drug activity that took place at various times from 1996 to 2010 are too remote in time to support probable cause in this case.

"The fourth amendment bars search warrants issued on less than probable cause, and there is no question that time is a crucial element of probable cause." *United States v. McCall*, 740 F.2d 1331, 1335 (4th Cir. 1984). Time is relevant because the court is fundamentally concerned with whether "the facts [as] alleged in the warrant furnish probable cause to believe, at the time the search was actually conducted, that evidence of criminal activity was located at the premises searched." *Id.* at 1336.

> This question is not resolved by reference to pat formulas or simple rules. The vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit. Rather, we must look to all the facts and circumstances of the case, including the nature of the unlawful activity alleged, the length of the activity, and the nature of the property to be seized.

*Id*. (internal citations and quotation marks omitted).

Here, Cannon is indicted on drug and money laundering conspiracy charges spanning more than a decade. Special Agent Farid "Jay" Rajaee, a co-case agent in this matter working for the United States Drug Enforcement Administration ("DEA"), provided an affidavit supporting the warrants in this case that includes information concerning Cannon's alleged drug activities over approximately fifteen years. In the affidavit, Agent Rajaee discusses five sources of information who allegedly bought drugs from Cannon or learned of Cannon's alleged activities through mutual customers in the years 1996 through 2010. Specifically, the affidavit recites an occurrence recalled by the second source of information regarding a drug transaction purportedly involving Cannon in the spring of 2010. The affidavit further details alleged conversations between Cannon and a source

of information concerning ongoing DEA investigations wherein Cannon purportedly asked the source to divert blame for the crimes away from him. In addition, the affidavit referenced calls that agents allegedly intercepted between Cannon and a co-conspirator that occurred in January 2011 in which agents contend they heard Cannon explain various methods to hide money should the co-conspirator go to prison.[2] The affidavit also explains Cannon's financial status including information believed to demonstrate several hundred thousand dollars of unexplained wealth. Looking at the totality of the circumstances, including the nature of the crime for which Cannon has been indicted, the court finds that the information in the affidavit was not stale. Accordingly, Cannon has not stated a sufficient basis upon which this court may invalidate the warrants and suppress the evidence discovered as a result of the execution of those warrants.

**Challenge of Statements Supporting Warrants and Request for a Franks Hearing**

Cannon also contends that the affidavits submitted in support of the search and seizure warrants issued in this case contained material misstatements and omissions entitling him to a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978). Specifically, Cannon contends that the agents intentionally or recklessly omitted dates from the affidavit to conceal the staleness of the information and inflated Cannon's financial information.

In order to be entitled to a *Franks* hearing, "a defendant must make a substantial preliminary showing" that the affiant included a false statement in the search warrant affidavit "knowingly and

---

[2]Cannon argues that the court suppress all information contained in the affidavit which was supplied by the fifth source of information because it was provided while the attorney representing the source was allegedly operating under a conflict of interest. As discussed herein, such argument is without merit. Furthermore, even if the court were to disregard the information provided by this source, the affidavit still contains sufficient information regarding Cannon's alleged criminal activities through the year 2010 to support a finding of probable cause necessary for the issuance of the warrants.

intentionally, or with reckless disregard for the truth." *Id.* "Warrant affidavits carry a 'presumption of validity.'" *United States v. McKenzie-Gude*, 671 F.3d 452, 462 (4th Cir. 2011) (quoting *Franks*, 438 U.S. at 164)). Therefore, to be entitled to a *Franks* hearing, a defendant must identify the specific portions of the affidavit that he claims are false and show why they are false. *United States v. Tate*, 524 F.3d 449, 454 (4th Cir. 2008). The defendant "must also furnish affidavits or sworn or otherwise reliable statements of witnesses or explain their absence" in order to meet his burden and be entitled to a hearing. *Id.* (quoting *Franks*, 438 U.S. at 171). "[A]llegations of innocent mistake or negligence are insufficient. The burden of making the necessary showing is thus a heavy one to bear." *Id.*

If the allegedly false statement is necessary to the finding of probable cause supporting the warrant, a hearing must be held at the defendant's request. *Franks*, 438 U.S. at 155-56. If the defendant shows by a preponderance of the evidence at the evidentiary hearing that false statements were included in the affidavit, the court should ignore the false statements contained in the affidavit and examine the affidavit's remaining content. *Id.* If the affidavit's remaining content is insufficient to establish probable cause for the search, "[t]he warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.* at 156.

Cannon contends that the affiants in this case, Agent Rajaee and Task Force Officer Kenneth Stewart, both of the DEA, failed to provide time frames during which the information in the affidavits regarding Cannon's alleged criminal conduct was obtained. Cannon claims that had the proper time frames been included in the affidavits, there would have been no probable cause to issue the warrants because the information regarding the alleged conduct was stale. In support of this contention, Cannon asserts that several allegations in the affidavits, from three different sources of

7

information, were obtained by law enforcement several years before the warrants were issued and, as a result, the information is stale rendering the warrants unsupported by probable cause.

The government concedes that Agent Rajaee omitted the date of the last time one source of information had dealings with Cannon, but notes that the omission actually makes the allegation in the affidavit appear much older than it actually is, and further argues that the issuing judge still determined that probable cause existed despite the omission and the appearance that the information was years old. The government also argues that Cannon's claim regarding the omitted time frame during which another source of information and Cannon allegedly bought and sold drugs is based on Cannon's misunderstanding of the facts. Although Cannon states that this source found another supplier for his drugs in 2008, the government indicates that source only stopped buying marijuana from Cannon in 2008 but continued to purchase cocaine from Cannon until 2010, a point Agent Rajaee included in his affidavit. The government also claims that Agent Rajaee's incorrect reporting of the date on which cocaine that Cannon allegedly provided to a source of information was seized from the source is the result of a typographical error. The affidavit states that the cocaine was seized in January 2010. However, it was actually seized in April 2010. The government argues that this error has no material effect on the validity of the warrant.

Cannon also argues that the affiants intentionally misrepresented the value of his property and the amount of his alleged unexplained income. Particularly, Cannon asserts that the agents misstated the value of his property as $103,680.00 in the affidavits where merely one month earlier they noted the value of the same property as $54,720.00. He also claims that the agents misstated the income deficit in the affidavits by stating that he and his wife had unexplained wealth of "at least $500,000.00" when reports dated approximately one month earlier provided an analysis of

8

unexplained wealth "of at least $400,000.00."

In response, the government explains that it used public records to determine the value of the Cannon's property, and that the values for the property in 2010 and 2011 were transposed in the preparation of the affidavit. Additionally, the government asserts that it merely attempted to conservatively estimate the amount of Cannon's unexplained income in the reports and affidavits. Although it is accurate that Agent Rajaee listed the Cannons' unexplained wealth as at least $400,000 in a report written one month before he listed the unexplained wealth as at least $500,000 in the affidavits at issue, the government contends that those documents are not inconsistent and that the numbers adjust as the investigation develops.

As discussed above, because this case concerns a conspiracy spanning multiple years, the very nature of the crime Cannon is alleged to have committed involves activities which would have occurred over an expanded period of time. However, even if the court finds that the affiants omitted the dates when they originally learned some of the information, include incorrect dates in the affidavits, or misstated his financial information, Cannon has not demonstrated that such omissions or misstatements were intentionally or recklessly made or how the errors or omissions would negate the issuing judge's finding of probable cause. Giving Cannon the benefit of the doubt on the disparities in the financial information, the affidavits would have still included allegations of at least $350,000.00 in unexplained wealth. In light of Cannon's drug activity alleged to have occurred as late as 2010 and the communications intercepted in 2011, the court finds that the issuing judge would have found that probable cause existed for the warrants had the affidavits not contained the errors of which Cannon now complains. The omissions and misstatements were negligent at worst, and negligence is not enough to entitle Cannon to a *Franks* hearing.

**Conflict of Interest**

Cannon's final ground for suppression of evidence concerns his assertion of prosecutorial misconduct in allegedly failing to timely notify the court about a conflict of interest in the representation of a source of information and Cannon. In his Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 145], Cannon contends that the government allowed, without providing appropriate notice to the court, an attorney to represent the source in providing information to the government that it intended to use against Cannon while the government was aware that Cannon was also represented by the same attorney. Additionally, Cannon asserts in his Supplemental Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 248] that the government further complicated the conflict of interest by reneging on its promise that the source would not be required to testify against Cannon and that the information provided to the government by the source regarding Cannon would not be used directly against Cannon. Cannon contends that he is a third-party beneficiary of this agreement, and the government's alleged breach of this agreement violates his due process rights.

In support of Cannon's motions, the attorney alleged to have operated under the conflict of interest testified concerning his understanding of the events giving rise to these motions. The attorney explained that he first met Cannon in the 1990s and began representing him in early 2000s on a parole hearing matter in state court in South Carolina. His next representation of Cannon did not occur until 2007, at which time Cannon began paying the attorney $250.00 per month as an "accessibility retainer." When asked if his representation of Cannon had been continuous since 2007, the attorney responded that Cannon had continuously paid the $250.00 per month and that he considered himself to be accessible to Cannon "if he had a question or wanted to do anything" but

10

"had nothing active for Mr. Cannon." The attorney further indicated that he began representing the source in April 2010 and that he continuously represented him until February 2012 when he was relieved as counsel.

Specifically as it relates to the alleged conflict of interest, the attorney testified that he became aware that Cannon had been named as a potential drug supplier during the investigation when he received discovery from the case involving the source of information in June 2011. In August 2011, the government contacted the attorney and indicated that it wanted the source to cooperate by providing information on Cannon. As a result of this communication from the government, the attorney advised the government of the potential conflict of interest in his representation of the source and Cannon and declined to have the source cooperate in any investigation against Cannon. The attorney also referred the source to independent counsel for advice concerning the potential conflict of interest issue. To the attorney's best recollection, he had no further discussions with the government regarding the conflict of interest issue.

The attorney next attests that, on September 13, 2011, the government contacted him and offered one last opportunity for the source of information to cooperate in the investigation into Cannon's activities. According to the attorney, the government agreed that they would not use the source's information against Cannon; would use only derivative information against Cannon- meaning, the government would use information gained from people the source disclosed as having dealt with Cannon; would not require the source to testify against Cannon; and would maintain the confidentiality of the source's cooperation.[3] Additionally, the source was required to be truthful and take a polygraph examination. The attorney and the source met with the government the same day

---

[3]This agreement was never memorialized in writing.

and provided information concerning Cannon. Cannon argues that the government did not keep its alleged promises of the September 13th agreement, and that this constituted a breach of the agreement.

At the hearing, the government read certain portions of the standard proffer agreement between the source and the government, which was entered into on March 2, 2011. It provided

> By signing this proffer agreement the client, in this case, [the source], agrees to be fully truthful and forthright with the United States Attorney's Office for the District of South Carolina and federal law enforcement agents in their investigation of all unlawful activities to include but not limited to truthful and complete debriefings with no misstatements or material omissions of fact of client's knowledge concerning all unlawful activities.

According to the government, the proffer statement continues to provide that if the source is untruthful "the Government at its sole election may void its obligations under this agreement."

The government also referenced a report from the September 13, 2011, meeting wherein the source discussed Cannon's alleged activities, answered various questions regarding information the source had previously provided the government, and specifically told Agent Rajaee that he had not been involved in any criminal activity since May 2011. Approximately two weeks later, on September 27, 2011, the source underwent a polygraph examination, at which time the source admitted to the examiner that he had participated in drug activity in July 2011. After receiving the polygraph examiner's report disclosing that the source was untruthful in his September 13th debriefing, the government notified the source's attorney that he was in breach of his proffer agreement and that the government intended to use all information the source had provided in any manner the government deemed appropriate.

"The Sixth Amendment right of the 'accused' to assistance of counsel in 'all criminal

prosecutions' is limited by its terms: 'it does not attach until a prosecution is commenced.'" *Rothgery v. Gillespie Cnty., Tex.*, 554 U.S. 191, 197 (2008) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991)). The United States Supreme Court has defined the commencement of prosecution as "the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Id.* (quoting *United States v. Gouveia*, 467 U.S. 180, 188 (1984)).

Once the right attaches, a defendant has a right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "The effective performance of counsel requires meaningful compliance with the duty of loyalty and the duty to avoid conflicts of interest, and a breach of these basic duties can lead to ineffective representation. . . [if] more than a mere possibility of a conflict [is] shown." *United States v. Tatum*, 943 F.2d 370, 375 (1991).

A defendant has a qualified right to counsel of his choice. *See Wheat v. United States*, 486 U.S. 153, 158-59 (1988).

> [A]n attorney's overlapping representation of two clients can compromise the Sixth Amendment guarantee of effective assistance of counsel when it creates an actual conflict of interest. To invoke this Sixth Amendment protection, a defendant must show some real conflict of interest resulting from the representation. The mere fact of overlapping representation is insufficient to create a Sixth Amendment violation.

*United States v. Taft*, 221 F. App'x. 277, 279 (4th Cir. Mar. 8, 2007) (unpublished table opinion) (internal citations and quotation marks omitted). To have an actual conflict of interest, the attorney must actively represent conflicting interests. *United States v. Tatum*, 943 F.2d 370, 375 (4th Cir. 1991). The critical determination is whether the attorney "is actively engaged in legal representation which requires him to account to two masters." *Id*.

In determining whether an attorney is actively engaged the legal representation of conflicting

interests, it may be helpful for the court to consider the factors indicating the establishment of the attorney-client relationship, including 1) whether there was a fee agreement and whether fees were paid; 2) whether there was a contract or retainer; 3) whether the attorney actually represented the individual in the matter at issue; and 4) whether the client believes the attorney was representing him and whether such a belief was reasonable in the circumstances. *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F. Supp. 233, 238 (S.D.N.Y. 1994). South Carolina courts have held that a retainer or other written agreement "is not dispositive of whether an attorney is representing a client." *In re Carter*, Appellate Case No. 2012–211406, 2012 WL 4808549, at *2 (S.C. Oct. 10, 2012) (citing *In re Broome*, 356 S.C. 302, 315, 589 S.E.2d 188, 195–96 (2003)). In addition, South Carolina courts have held that "a person attains the status of a "client" when that person seeks legal advice by communicating in confidence with an attorney for the purpose of obtaining such advice." *Marshall v. Marshall*, 282 S.C. 534, 539, 320 S.E.2d 44, 47 (Ct. App. 1984). Other courts beyond our district have reached similar conclusions. *See e.g. First Hawaiian Bank*, 861 F. Supp. at 238 (S.D.N.Y. 1994) (noting that "[m]ost courts have acknowledged, as a general matter, that an attorney-client relationship exists if the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice."). The party seeking the protections afforded through the attorney-client relationship has the burden of proving the attorney-client relationship existed. *See e.g. In re Grand Jury Subpoena: Under Seal,* 415 F.3d 333, 339 (4th Cir. 2005) (placing the burden of proving that an attorney client relationship existed on the client seeking to invoke the attorney-client privilege).

"When a conflict [of interest] situation becomes apparent to the government, the government has a duty to bring the issue to the court's attention and, if necessary, move for disqualification of

14

counsel." *See Tatum*, 943 F.2d at 375. Upon notice of the apparent conflict, the court is tasked with investigating further and if necessary, advising the defendant personally as to his rights, and receiving a knowing waiver from the defendant. *Id.* The purpose of this requirement is to allow the court to ensure that the trial is conducted in a way that protects the rights of the accused, especially his Sixth Amendment right to the effective assistance of counsel. *Id.*

In these motions, Cannon argues that, when the government became aware of the attorney's potential conflict of interest resulting from his association with Cannon and current representation of the source of information, the government then had a duty to report the conflict to the court. To determine whether the government complied with the relevant notice requirements, the court must first consider the scope of the relationship between Cannon and the attorney.

Based on the attorney's testimony at the hearing, the court cannot conclusively determine that the attorney actively represented Cannon at the time he represented the source during the September 13, 2011, debriefing or that the attorney engaged in any protected communications which presented an actual conflict of interest. Although the attorney stated that Cannon paid him $250 per month to be "accessible," he also stated that he had not actually represented Cannon in any matter since 2007. He further stated that he had no active matters with Cannon during the time he represented the source. It was not until Cannon's arrest and initial court appearance that anything arose requiring the attorney's attention, and he testified that he and the government promptly notified the court of the conflict of interest. Cannon then received the assistance of other counsel and there was no actual overlap in representation on the instant case. Accordingly, while Cannon argues that there may have been at least the potential for a conflict of interest as early as August 2011 when the attorney notified the government of his association with Cannon, the fundamental rights arising under the Sixth

Amendment which are sought to be protected by the notice requirement did not apply to Cannon at that time. Other than the payment of the retainer fee, Cannon has provided the court with no evidence, either through the attorney's testimony or otherwise, to establish that there was any communication between the attorney and Cannon that would allow this court to find that the attorney actively represented Cannon during the relevant period. Accordingly, the government did not commit any misconduct, as to the attorney's relationship with Cannon, in failing to notify the court of the alleged potential conflict prior to the source's debriefing.

Cannon also argues that his due process rights were infringed as a result of the government's violation of its agreement with the source to not use any information provided by the source against Cannon. The basis for this argument lies in Cannon's assertion of rights as a third-party beneficiary to the agreement.

Initially, the court finds that Cannon has failed to establish that he is a third-party beneficiary of the agreement. The Fourth Circuit Court of Appeals has acknowledged that it may be appropriate to apply contract law principles to agreements between the government and criminal defendants. *See United States v. Smith*, 976 F.2d 861, 863 (4th Cir. 1992) (finding that agreements between the government and criminal defendants have characteristics of commercial contracts but also reflect concerns that are "constitutionally based" and "differ fundamentally from and run wider than those of commercial contract law."); *United States v. Harvey*, 791 F.2d 294, 300 (4th Cir. 1986) (applying contract law principles to the interpretation of a plea agreement, but noting that constitutional concerns "require holding the Government to a greater degree of responsibility than the defendant."). Generally, contract law allows a third-party to benefit from a contract to which it is not a party only where there is a clear demonstration that the parties to the contract intended the third-party to directly

16

benefit from the agreement. *See Brantley v. Republic Mortg. Ins. Co.,* 424 F.3d 392, 396 (4th Cir. 2005). Although not addressed by courts within the Fourth Circuit, courts in other jurisdictions have acknowledged that the third-party beneficiary concept could have application in the context of agreements entered into by criminal defendants. *See United States v. Andreas*, 216 F.3d 645, 663 (7th Cir. 2000) (while not acknowledging any third-party beneficiary rights in an immunity agreement, the Seventh Circuit Court of Appeals noted "Individuals who are not parties to a contract may enforce its terms only when the original parties intended the contract to directly benefit them as third parties."); *see also S.E.C. v. Johnson*, 534 F. Supp. 2d 63, 69 (D.D.C. 2008) (finding that a third-party could not gain any benefit from a proffer letter because nothing in the letter indicated "that either of the parties to the agreement intended to benefit" the third-party).

Neither the March 2011 proffer agreement nor the September oral agreement support Cannon's theory of any third-party beneficiary status. Although Cannon relies heavily on the September 2011 oral agreement between the government and the source, nothing about that agreement as the attorney related it to the court at the hearing demonstrates that it was the intention of either of the contracting parties that the agreement inure to Cannon's benefit. While it is true that the source sought protection from being identified through a confidentiality provision, a provision allowing him to avoid testifying at trial, and a provision limiting the use of the source's information, it is illogical to conclude that the government ever intended for Cannon to be a beneficiary of an agreement formed for the sole purpose of gathering information that the government could use, even indirectly, against Cannon.

Second, even if Cannon were a third-party beneficiary, he has failed to establish that there is any benefit to be gained from the agreement between the government and the source. "When the

Government has entered into [an agreement with a criminal defendant], it is well established that federal courts must enforce the agreement and not allow the Government to retract its promises. Where a defendant has relied on the Government's representations and has upheld his obligations under such an agreement, the Government will also be required to honor its promises." *United States v. CFW Const. Co., Inc.*, 583 F. Supp. 197, 202 (D.S.C. 1984). However, in this case the government has made the undisputed allegations that the source breached the agreement and, therefore, the September 2011 agreement would not be enforceable against the government. Furthermore, the government argues that the September 2011 agreement was part and parcel of the March 2011 proffer agreement, which terms expressly allowed the government to void the agreement upon the source's breach.

The evidence in the record reflects that the language from the source's March 2011 proffer agreement unambiguously provides that the government may void the agreement and use the information provided by the source in any manner it deems appropriate if the source is not truthful regarding all criminal activity. Additionally, the only evidence in the record concerning the September 2011 oral agreement is the testimony of the attorney in which he attests that the agreement includes the requirement that the source "tell the truth" and "be subject to a polygraph." Although defense counsel vigorously argued that it is the government that breached the agreement and the court should narrowly construe the agreement with the additional qualifying language that the source need only be truthful about Cannon's criminal activity, there is no such evidence in the record from which the court can construe the oral agreement with such qualification. Indeed, the language recited by the attorney only provided that the source must be truthful, without qualification as to Cannon or any other topic of discussion during the September 13, 2011, debriefing.

Instead, the record reflects that the government made an undisputed allegation of the source's breach, which it supported by directing the court's attention to the agent's report from the September 13, 2011, debriefing wherein the source discussed a myriad of topics including omissions and discrepancies concerning undisclosed property, money, and drugs, Cannon's alleged drug activities, and various questions regarding the source's criminal activity. The government particularly noted that the report indicated that the source stated his last involvement in criminal activity occurred in May 2011. The government then directed the court's attention to a report provided by a polygraph examiner stating that the source admitted participating in criminal activity in July 2011. The government further noted for the record, and defense counsel conceded, that the source was subject to a bond revocation as a result of this activity and that this activity was construed as a breach of the agreement between the government and the source. Accordingly, the court finds that Cannon cannot demonstrate that there is any enforceable agreement from which he could gain any benefit even if he were considered a third-party beneficiary.

Finally, Cannon has continuously implied, throughout these proceedings, that the suppression of this particular source's information would somehow collapse the government's case against Cannon. Based on the testimony from the attorney at the hearing and the affidavit currently in the record, it appears that, even before the source agreed to discuss Cannon's activities with the government, the government had produced several statements from the source's co-conspirators potentially implicating Cannon in drug activity. Additionally, Cannon ignores that even if the source's information could not be used directly against Cannon, it was clearly the intention and understanding of the parties that the information would be used to gather information from others to use against Cannon. The affidavit demonstrates and the government has represented that it is

19

prepared to present several witnesses in its case, other than this particular source, against Cannon. Accordingly, as the court has previously stated above, the affidavit contained sufficient allegations of criminal activity, even excluding this source's statements, for a finding of probable cause.

## CONCLUSION

Having considered the memoranda filed by the parties, arguments of counsel and testimony at the hearing, and the record currently before the court, the court **DENIES** Defendant Cannon's Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 145] and Supplemental Motion to Suppress Tangible and Derivative Evidence [Dkt. No. 248].

**IT IS SO ORDERED.**

*J. Michelle Childs*

United States District Judge

November 1, 2012
Greenville, South Carolina